UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

BRIAN HOWARD ELLIOTT,

                          Petitioner,

        v.

ELDON VAIL and WASHINGTON
STATE DEPARTMENT OF
CORRECTIONS,

                          Respondents.

No. C11-5377 BHS/KLS

**REPORT AND RECOMMENDATION**
**Noted for:  November 30, 2012**

Pro se petitioner Brian Howard Elliott petitions for 28 U.S.C. § 2254 habeas relief from his 2005 conviction for first-degree rape of a child.  Petitioner alleges nine grounds for federal review.  ECF No. 1.  The Court dismissed all but Grounds Two, Nine, and Sub-Claim One of Ground Five.  ECF Nos. 38 (Report and Recommendation) and 44 (Order Adopting).  On April 17, 2012, Respondent submitted a Supplemental Response and Notice of Filing State Court Record, Exhibits 19-20.  ECF Nos. 40 and 41.

The Court directed additional briefing on Grounds Two, Nine, and Sub-Claim One of Ground Five.  ECF No. 45.  On August 29, 2012, the Court noted that Respondent's supplemental brief submitted on April 17, 2012 was sufficient to meet Respondent's obligation and noted the habeas petition for four Fridays hence.  ECF No. 47.  Petitioner did not file a reply.

The undersigned recommends denying Grounds Two, Sub-Claim One of Ground 4, and Ground Nine, with prejudice.

REPORT AND RECOMMENDATION - 1

**BACKGROUND**

In 2005, Mr. Elliott was convicted of first-degree rape of a child and sentenced to 93 months of incarceration.  ECF No. 16, Exh. 1, at 4.  He was released from prison in 2009 and filed this petition while on community custody.  ECF No. 1.  His 2005 jury trial conviction followed a reversal by the Washington Court of Appeals of his convictions in 2001 of two counts of first degree child rape.  ECF No. 16, Exh. 5, at 1.

A.     **Factual Background**

The Court of Appeals, upon remand, summarized the facts and the procedural posture of Mr. Elliott's case as follows:

> This appeal follows Elliott's second trial, which, in turn, follows our reversal of his 2001 convictions on two counts of first degree child rape.  *State v. Elliott*, 121 Wn. App. 404, 88 P.3d 435 (2004).  There, we held that the trial court erred in preventing Elliott from challenging the reliability and validity of the State's polygraph test on foundational grounds and in refusing to allow Elliott's expert to testify about his interpretation of it.  *Elliott*, 121 Wn. App. at 409-10.  Following a second trial, the jury convicted Elliott of one count of first degree child rape.
>
> M.J. is the granddaughter of Elliott's wife, Martha.  In August 2000, when M.J. was five years old, she and her mother were reading a bedtime story when M.J. pointed to her vagina and stated, "Well, Brian just doesn't understand when I tell him he can't touch me there."  Report of Proceedings (RP) (Jan. 31, 2005) at 233-34.  M.J. said that Elliott had put "his vagina in her vagina," that he had licked her vagina, and that he had taken pictures while she touched her vagina.  RP (Jan. 31, 2005) at 238.  M.J. told her mother that this happened on Martha and Brian's bed.
>
> M.J.'s parents took her to a medical clinic for an examination.  Before examining M.J., pediatric nurse Michelle Breland asked M.J. if anything had ever happened to her body that she did not like.  M.J. answered, "There was one time Brian hurt me on my vagina.  Brian is my grandpa.  He does bad stuff to me.  He's not a nice guy."  RP (Feb. 1, 2005) at 308-09.  M.J. also told Breland that Elliott had "been licking me and making milk."  RP (Feb. 1, 2005) at 309.  Breland asked what "making milk" meant, and M.J. replied, "By putting his vagina, I mean penis, into mine.  I call it a penis."  RP (Feb. 1, 2005) at 309.  M.J. said that Elliott had hurt her vagina more than once and on "lots of different days"

REPORT AND RECOMMENDATION - 2

when she was five years old.  RP (Feb. 1, 2005) at 311.  Breland asked where Elliott had licked her, and M.J. pointed to her vaginal area and said, "[I]n here." RP (Feb. 1, 2005) at 311.  M.J. said that she had seen Elliott's penis and described it as "big like a worm."  RP (Feb. 1, 2005) at 312.  M.J. also said that Elliott had taken pictures of her private area.  M.J. told Breland, "The one time he put his penis in here it hurt.  The one where he licks, it just tickles."  RP (Feb. 1, 2005) at 315.

Christa Sommerfeld, a child interviewer for the Pierce County Prosecutor's Office, also interviewed M.J.  M.J. told Sommerfeld that Elliott had licked her vagina when she was at his house watching cartoons.  M.J. said it happened more than one time in Elliott's bedroom and on different days when she was between four and five years old.  She also said that Elliott took pictures of her vaginal area.  M.J. disclosed that one time Elliott had put his penis in her vagina and that it had hurt.

During the police investigation, Elliott stipulated to a polygraph examination administered by a police examiner.  According to the stipulation, if Elliott passed the polygraph, the State would dismiss the charges against him.  If Elliott failed the polygraph, the polygraph results would be admissible at trial.  If inconclusive, the polygraph test and the results would not be admissible at trial. Additionally, if the polygraph was admitted, Elliott agreed that he would not call any witnesses to testify about the validity of polygraph testing in general or whether his results were reliable.  Elliott also agreed not to mention the results of any other polygraph test that he might have taken.

Detective Sergeant Keith Barnes of the Pierce County Sheriff's Department administered the polygraph test.  According to Barnes, Elliott's denials to the question, "Is [M.J.'s] report about you sexually molesting her true?" and "Did you touch [M.J.'s] bare vagina with your tongue?" showed deception. RP (Feb. 3, 2005) at 827-33.  The results were inconclusive to the question, "Did you put any part of your penis in [M.J.'s] vagina?"  RP (Feb. 3, 2005) at 833.  As agreed in the stipulation, the State charged Elliott with first degree child rape.

## II.  2005 Trial

During pretrial motions, Elliott moved to reconsider the previous trial court's ruling admitting the hearsay testimony of M.J.'s mother, Breland, and Sommerfeld regarding M.J.'s previous statements.  The trial court admitted the statements by "adopting Judge van Doorninck's ruling" from Elliott's first trial. RP (Jan. 26, 2005) at 371.  Elliott did not object to the court's failure to hold another hearing on the issue.

The trial court also held a hearing to determine whether M.J. was competent to testify.  There, the prosecutor asked M.J. if she knew "what it means

REPORT AND RECOMMENDATION - 3

to tell the truth." RP (Jan. 10, 2005) at 58.  M.J. responded, "Not to tell a lie."
RP (Jan. 10, 2005) at 58.  When asked if she knew what it means to tell a lie, M.J.
said, "No."  RP (Jan. 10, 2005) at 58.  Then the prosecutor asked her to identify a
series of statements as being the truth or a lie, which M.J. did correctly.  She
identified the statement that the prosecutor's shirt was blue as true, the statement
that the Washington State flag was bright red as a lie, and the statement that the
judge's robe was black as true.  M.J. then promised to tell the truth.  In response
to the prosecutor's questions, M.J. remembered the name of her teacher, the
schools she went to the year before, and her teachers at those schools.  She
identified her second grade teacher's name as Mr. Bloomer and her first grade
teacher as "Ms. Cake-e-bon (phonetic)."  RP (Jan. 10, 2005) at 61-62.  She
described the places she had lived from age four to her current home.  About her
current apartment, she stated, "If you were to go diagonally, [our previous
apartment is] just diagonal from our step."  RP (Jan. 10, 2005) at 71.

In addition, M.J. testified about details of Elliott's house: it had "[a]bout
three" TVs, one "in the living room" where she watched "Tom and Jerry;" it had a
greenhouse where she had helped her grandmother plant plants; and Elliott's dogs
were named "Lucky and Tray."  RP (Jan. 10, 2005) at 66-68.  M.J. also recounted
the alleged abuse: "[s]omething bad happened to me" at Elliott's house; it had to
do with her "private," pointing to her vaginal area; Brian did the bad thing, which
was "hard to say;" he did it with his tongue, "[o]n my skin," and he did it more
than once.  RP (Jan. 10, 2005) at 72, 74-75.  M.J. did not remember talking about
the incident with anyone other than her mother, her father, and Clay (a
prosecutor).  She also did not remember going to Mary Bridge Children's
Hospital.  Based on this testimony and the previous trial court's competency
ruling, the trial court found that M.J. was competent to testify.

At trial, M.J. maintained that Elliott licked her vagina with his tongue.  In
contradiction with her earlier statements, however, she stated that he always wore
clothes, she did not see his penis, he never touched her with his penis, and he
never put his penis in her vagina.

Breland, when asked about M.J.'s disclosure, testified that it "had a lot
more detail in it than what most kids have, than many kids have."  RP (Feb. 1,
2005) at 314.  Breland testified that M.J.'s statements "are not what typical five
year olds know.  Five year olds don't typically know about penises and vaginas
and licking vaginas and making milk.  To me, that demonstrated an advanced
knowledge of sexual activities which certainly raises the question: where does
that come from?"  RP (Feb. 1, 2005) at 348.  Breland also testified that M.J.'s
physical examination revealed only an inconclusive finding of hymen indentation.

During Sommerfeld's testimony, the prosecutor questioned her about the
protocol she uses with children who may be victims of a sexual assault. She
testified:

REPORT AND RECOMMENDATION - 4

[Sommerfeld]:  . . . You start the interview making sure the child is—can tell you the difference between the truth and a lie.  That's very essential to the process.  Also, that they understood a few key terms such as inside and outside and on top and underneath.  You need to make sure they understand those concepts.

[Prosecutor:]  Why do you cover those topics?

[Sommerfeld:]  Truth is very important.  We make sure the child -- the first question is, everything you say today needs to be the truth.  That's very important.  We want a truthful interview.  Then the other –

[Prosecutor:]  Do you also indicate or tell the child [why] they are there?

[Sommerfeld:]  They are told they're not in trouble.  Let them know they're not in trouble today.  Anything they say they won't be in trouble for.  The important thing is to be honest and tell the truth.  That's why you're trying to assess before you ask the questions do they understand the truth.

RP (Feb. 1, 2005) at 395.

Later, the prosecutor inquired further into the interview process:

[Prosecutor:]  When you ask those questions, was [M.J.] able to distinguish between truth and a lie?

[Sommerfeld:]  Yes.

. . .

[Prosecutor:]  Tell us what question[s] you asked her.

[Sommerfeld:]  The next question, which is standard for all interviewers is - - do you want me to read it?

[Prosecutor:]  Yes.

[Sommerfeld:]  "Now, [M.J.], I have some different kinds of questions for you.  I want you to know you're not in any trouble today.  It is very important that everything you say be the truth.  Do you promise to tell the truth today?"

[Prosecutor:]  When you asked [M.J.] that question, what was her response?

[Sommerfeld:]  She said, "Yes, it is just kind of scary."

RP (Feb. 1, 2005) at 403-04.

During the State's case, the trial court admitted Elliott's stipulated polygraph examination.  The trial court allowed the defense attorney to cross-examine the administrator of the exam, Detective Barnes, and to call an expert witness, Steve Hamre, to interpret Barnes's findings.  Hamre testified that he interpreted the polygraph as showing that Elliott had been truthful when he denied touching M.J.'s vagina with his penis or tongue.  Hamre found the results

REPORT AND RECOMMENDATION - 5

inconclusive as to the question, "Is [M.J.'s] report about you sexually molesting her true?" RP (Feb. 7, 2005) at 1026.

Hamre had administered another polygraph exam, not stipulated to by the State, that showed that Elliott was truthful. The trial court excluded the results of this examination and precluded Elliott from asking Hamre or Barnes about it. The jury convicted Elliott on the first count of first degree child rape (oral/vaginal intercourse) and acquitted him on the second count (penile/vaginal intercourse).

ECF No. 16, Exh. 5 (Unpublished Opinion, State v. Elliott, Washington Court of Appeals Cause No. 33257-4-II, at 1-7). The factual summary of the Washington Court of Appeals is accorded a presumption of correctness. 28 U.S.C. § 2254(e)(1); *Moses v. Payne*, 555 F.3d 742, 746 n.1 (9th Cir. 2009) (*citing Hernandez v. Small*, 282 F.3d 1132, 1135 n.1 (9th Cir. 2002).

**B.     Procedural History**

The procedural history is set forth in detail in this Court's previous Report and Recommendation and will not be repeated here. ECF No. 38.

<strong>FEDERAL HABEAS GROUNDS FOR REVIEW</strong>

The following grounds for federal habeas review are discussed in this Report and Recommendation:

2)     Petitioner's Sixth Amendment right of confrontation was violated when MJ did not testify sufficient to allow cross-examination.

5)     The trial court erred when it failed to consider the reliability or validity of the MGQT polygraph administered by the State.

9)     Admission of hearsay evidence was impermissible because MJ was incompetent and as such unavailable and the trial court erred by failing to subject hearsay evidence to further review (including testimony by nurse practitioner and child forensic interviewer and victim's mother).

ECF No. 1, Attachment 2, Grounds for Review, pages 1-5.

REPORT AND RECOMMENDATION - 6

1

**STANDARD OF REVIEW**

2        Federal courts may intervene in the state judicial process only to correct wrongs of a

3   constitutional dimension. *Engle v. Isaac*, 456 U.S. 107, 102 S.Ct. 1558, 71 L.Ed.2d 783 (1982).

4   Federal habeas corpus relief does not lie for mere errors of state law. *Estelle v. McGuire*, 502

5   U.S. 62, 112 S. Ct. 475, 116 L.Ed.2d 385 (1991); *Lewis v. Jeffers*, 497 U.S. 764, 110 S. Ct. 3092,

6   111 L.Ed.2d 606 (1990); *Pulley v. Harris*, 465 U.S. 37, 41, 104 S. Ct. 871, 79 L.Ed.2d 29 (1984).

7

8        A federal court cannot grant a writ of habeas corpus to a state prisoner with respect to any

9   claim adjudicated on the merits in state court unless the state court's adjudication of the claim (1)

10   resulted in a decision that was contrary to, or involved an unreasonable application of, clearly

11   established Federal law, as determined by the Supreme Court of the United States; or (2) resulted

12   in a decision that was based on an unreasonable determination of the facts in light of the

13   evidence presented in the State court proceeding.  28 U.S.C. § 2254(d).   State court decisions

14   must be given the benefit of the doubt. *Woodford v. Visciotti*, 537 U.S. 19, 24, 123 S.Ct. 357

15   (2002).

16

17        A state court decision is "contrary to" the Supreme Court's "clearly established precedent

18   if the state court applies a rule that contradicts the governing law set forth" in the Supreme

19   Court's cases or if the state court confronts a set of facts that are materially indistinguishable

20   from a decision of the Supreme Court and "nevertheless arrives at a result different from that

21   precedent." *Lockyer v. Andrade*, 538 U.S. 63, 73, 123 S.Ct. 1166 (2003) (*quoting Williams v.*

22   *Taylo*r, 529 U.S. 362, 405-06, 120 S.Ct. 1495 (2000)).  "The 'unreasonable application' clause

23   requires the state court decision to be more than incorrect or erroneous." *Lockyer*, 538 U.S. at

24   75.  That is, "[t]he state court's application of clearly established law must be objectively

25   unreasonable." *Id.*

26

REPORT AND RECOMMENDATION - 7

Under 28 U.S.C. § 2254(d)(2), a federal petition for writ of habeas corpus also may be granted "if a material factual finding of the state court reflects 'an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.'" *Juan H. v. Allen*, 408 F.3d 1262, 1270 n.8 (9th Cir. 2005) (quoting 28 U.S.C. § 2254(d)(2)).  However, "[a] determination of a factual issue made by a State court shall be presumed to be correct," and the petitioner has "the burden of rebutting the presumption of correctness by clear and convincing evidence."  28 U.S.C. § 2254(e)(1).

## DISCUSSION

**A.    Ground Two – Confrontation**

Mr. Elliott argues that his Sixth Amendment right of confrontation was violated when M.J.'s testimony on direct did not allow for sufficient cross-examination. ECF No. 1, at 24.

The Washington Court of Appeals addressed and rejected Mr. Elliott's claim on direct appeal:

### IV.    M.J.'s COMPETENCY

A.    Errors and Inconsistencies in M.J.'s Testimony

The trial court determines a child's competency to testify at trial under the standards of RCW 5.60.050. *State v. C.J.*, 148 Wn.2d 672, 686, 63 P.3d 765 (2003).  A child is competent to testify at trial if she (1) understands the obligation to speak the truth on the witness stand, (2) had the mental capacity at the time of the occurrence to receive an accurate impression of the matter about which she is to testify, (3) has sufficient memory to independently recall the occurrence, (4) has the capacity to express in words her memory of the occurrence, and (5) is capable of understanding simple questions about it.  *State v. Allen,* 70 Wn.2d 690, 692, 424 P.2d 1021 (1967); *C.J.,* 148 Wn.2d at 682 (citing *State v. Swan,* 114 Wn.2d 613, 645, 790 P.2d 610 (1990)).  A competency ruling is not necessarily dependent on the child's recollection of the events at issue.  *Przybylski*, 48 Wn. App. at 665.  A trial court's decision that the child meets these requirements lies within the court's sound discretion, which we review for an abuse of discretion. *Allen,* 700 Wn.2d at 692.

REPORT AND RECOMMENDATION - 8

In evaluating a child's competency, the evidence must show that the child can identify a lie and understand that lying is wrong; her testimony does not have to be entirely consistent.  *See Przybylski,* 48 Wn. App. at 666.  The trial court need not find the child incompetent just because her testimony contradicts the testimony of other witnesses or it is internally inconsistent.  *See State v. Strange,* 53 Wn. App. 638, 641-42, 769 P.2d 873 (1989).  Rather, a child's inconsistencies and contradictions go to the weight of the testimony, not its admissibility. *Strange,* 53 Wn. App. at 642; *State v. Woodward,* 32 Wn. App. 204, 208, 646 P.2d 135 (1982).  The defendant may impeach the child witness's credibility, like any other witness, by pointing out inaccuracies and inconsistencies in her testimony.  *Prsbylski,* 48 Wn. App. at 665.

Before the first trial, in 2002, the trial court held a competency hearing for M.J.  The trial court conducted a new competency hearing in 2005, before the second trial.  At this hearing, M.J. knew it was a truth that the judge was wearing a black robe and a lie that the Washington state flag in the courtroom was red.  She knew her age, birthday, school grade, and teachers.  She remembered the names of Elliott's dogs, watching "Tom and Jerry" at his house, and planting plants in the greenhouse on his property.  She testified that something bad happened to her in the living room of her grandmother's house when she was alone with Elliott.  Elliott had used his tongue to touch her private area on the skin.  When asked where her private part was, M.J. pointed to her vaginal area. M.J.'s testimony at the competency hearing did, at times, conflict with statements her mother made, as well as with her 2003 testimony.

The trial court expressly used the *Allen* test to determine her competency. The court concluded that M.J. understood the difference between the truth and a lie and that she "understood her obligation and understands at this time her obligation to speak the truth from the witness stand."  RP (Jan. 11, 2005), AT 349, 351.  After evaluating the relevance of the findings from the first competency hearing, the trial court adopted the first trial judge's findings as to M.J.'s ability at the time of the incident to absorb an accurate impression of that incident and her ability to retain an independent memory of the incident.  The trial court, particularly impressed with M.J.'s use of the four-syllable word "diagonally" to describe her apartment's location, found that she had the mental capacity to express her memory in words.  RP (Jan. 11, 2005) at 350.  The trial court commented that M.J. clearly tracked and understood questions, responded to them, and communicated with attorneys on matters that were not of particular concern to her.  Finally, the trial court acknowledged that M.J. did not remember portions of her earlier testimony and that some of her testimony contradicted her mother's, but concluded that the discrepancies in M.J.'s testimony were for the trier of fact to resolve.

REPORT AND RECOMMENDATION - 9

Elliott argues that because M.J. described events that could not have occurred exactly as she testified, she could not distinguish truth from falsity, and the trial court thus erred in finding M.J. competent to testify at trial. Elliott's argument fails on two points: (1) a child's ability to distinguish the truth from a lie does not depend on her ability to remember the specific events contested at trial and (2) inconsistencies in a child's testimony go to credibility, not competency. The trial court expressly evaluated M.J.'s ability to tell the truth and found her competent. The trial court did not abuse its discretion by deciding that M.J. was competent as measured against the *Allen* standards.

B.      Trial Court's Use of the Previous Trial Court's Ruling on Competency

Elliott also argues that the trial court abused its discretion by relying on the previous trial court's 2002 ruling that M.J. was competent to testify. Specifically, Elliott contends that the two-and-a-half year lapse between the two trials required the trial court to evaluate M.J.'s independent recollection of events without considering the first court's findings. Against, we review a trial court's competency ruling for an abuse of discretion. *Allen*, 70 Wn.2d at 692.

In ruling on M.J.'s competency to testify, the trial court found the previous competency ruling relevant to her mental capacity at the time of the event. The trial court also found the related findings helpful in determining whether M.J. independently recalled the events because the first hearing "was closer in time to the time of the event, and therefore, that evidence of mental capacity was not quite so distant." RP (Jan. 11, 2005) at 348. In determining whether M.J. still independently recalled the occurrence, the trial court considered M.J.'s testimony about objective facts, in addition to her memory of the contested events. The court remarked that she knew where her father and mother worked, the pets in their homes, and the number of TVs in Elliott's home. The court also noted M.J.'s ability to distinguish between two apartments in the same townhouse where she had lived. Finally, the trial court evaluated M.J.'s testimony about the sexual contact. She "described it, what part of her body was involved, pointed to it. She said who did it: Mr. Elliott. She said he used his tongue. She said he did it more than one time. She confirmed that it was done on the skin." RP (Jan. 11, 2005) at 351. The trial court acknowledged that M.J. did not remember, or did not testify to, discussing the abuse with many of the people with whom she had in fact discussed it, but based on her testimony at the hearing, he determined that she "retained an independent recollection of some of the events that have been previously described." RP (Jan. 11, 2005) at 351-52.

The trial court did not abuse its discretion by considering the first trial court's competency ruling, in part, as one measure of M.J.'s competency against the *Allen* standards. *Allen* requires that the trial court find that M.J. had sufficient memory to recall the events in question. *Allen*, 70 Wn.2d at 692. This part of the *Allen* test may therefore be satisfied by asking the child about objective facts

REPORT AND RECOMMENDATION - 10

known to the court. *Przybylski,* 48 Wn. App. at 665. The trial court did this in addition to asking about the event and found that M.J.'s memory was sufficient under *Allen.* Moreover, no legal authority supports Elliott's argument that trial courts are barred from considering the findings of a previous competency hearing when evaluating whether a child retains an independent memory of events. The trial court analyzed M.J.'s testimony at the 2005 competency hearing under all five parts of the *Allen* test and limited its consideration of the first trial court's ruling to the relevant portions. We hold that the trial court did not abuse its discretion by considering the first trial court's competency findings.

ECF No. 16, Exhibit 5, at 16-20.

The Confrontation Clause of the Sixth Amendment provides that "[i]n all criminal prosecutions, the accused shall enjoy the right ... to be confronted with the witnesses against him...." U.S. Const. amend. VI. This right ensures reliability by requiring statements under oath, the submission to cross-examination, and the opportunity for the jury to assess witness credibility. *California v. Green*, 399 U.S. 149, 158, 90 S.Ct. 1930, 26 L.Ed.2d 489 (1970).

Testimonial hearsay statements are barred under the confrontation clause unless the declarant is unavailable and the defendant had prior opportunity to cross-examine the declarant. *Crawford v. Washington*, 541 U.S. 36, 68–69, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004). The term testimonial "applies at a minimum to prior testimony at a preliminary hearing, before a grand jury, or at a former trial; and to police interrogations." *Crawford*, 541 U.S. at 51–52, 68 (also describing in more detail the three formulations of the "core class of 'testimonial' " statements in which a party " bear[s] testimony'" against another) (quoted sources omitted).

However, there is no confrontation clause violation where the declarant testifies and is subject to cross-examination. *Id.* at 59 n. 9 ("[W]hen the declarant appears for cross-examination at trial, the Confrontation Clause places no constraints at all on the use of his prior testimonial statements.... It is therefore irrelevant that the reliability of some out-of-court statements 'cannot be replicated, even if the declarant testifies to the same matters in court.'" "... The Clause does

REPORT AND RECOMMENDATION - 11

not bar admission of a statement so long as the declarant is present at trial to defend or explain it.") (citations omitted); *Green*, 399 U.S. at 162 ("[W]here the declarant is not absent, but is present to testify and to submit to cross-examination, our cases, if anything, support the conclusion that the admission of his out-of-court statements does not create a confrontation problem.").

Also, the Confrontation Clause is not implicated merely by alleged flaws in a witness's testimony or ability to testify. As stated by the Supreme Court:

> The Confrontation Clause includes no guarantee that every witness called by the prosecution will refrain from giving testimony that is marred by forgetfulness, confusion, or evasion. To the contrary, the Confrontation Clause is generally satisfied when the defense is given a full and fair opportunity to probe and expose these infirmities through cross-examination, thereby calling to the attention of the factfinder the reasons for giving scant weight to the witness' testimony."

*Delaware v. Fensterer*, 474 U.S. 15, 21–22, 106 S.Ct. 292, 88 L.Ed.2d 15 (1985). That is, the Confrontation Clause guarantees only "an opportunity for effective cross-examination, not cross-examination that is effective in whatever way, and to whatever extent, the defense might wish." *Id*. at 20 (emphasis in original). *Accord United States v. Owens*, 484 U.S. 554, 558, 108 S.Ct. 838, 98 L.Ed.2d 951 (1988).

As such, the testimony of a young child does not offend the Confrontation Clause as a matter of course, even where, for example, that child presents as "vacillatory and manipulatable" or demonstrates an "[i]ncapacity to understand the duty to testify truthfully[.]" *Walters v. McCormick*, 122 F.3d 1172, 1175–76 (9th Cir.1997). "At least where ... there is reason to believe that the incriminating testimony will be truthful, a young child may constitutionally be a witness." *Id*. (also noting that "[n]o federal court has held that the Constitution places limits on allowing even the youngest child to testify at trial.")

REPORT AND RECOMMENDATION - 12

The Washington Court of Appeals applied the *Allen* test in evaluating this issue on direct appeal.  ECF No. 16, Exhibit 5, at 16.  *Allen* is based, in part, on *State v. Ridley*, 61 Wn.2d 457 (1963), which in turn extensively relies on *Wheeler v. United States*, 159 U.S. 523 (1895). *Wheeler* reasoned the age of the child is not a decisive factor in determining if the child can testify; rather the trial court should determine if the child can appreciate the difference between falsehood and truth, understands his obligation to tell the truth and has the mental capacity and intelligence to testify; and the court should evaluate the child's capacity, intelligence, and understanding of the obligations of an oath. *Wheeler*, 159 U.S. at 524-525.

Pursuant to § 2254(e)(1), a trial court's finding as to the competency of a witness to testify is presumed correct and may be rebutted only with the presentation of clear and convincing evidence.  *Haliym v. Mitchell*, 492 F.3d 680, 700 (6th Cir.2007) (state court finding that seven-year-old witness was competent to testify presumed correct). See also generally *Dennis v. Budge*, 378 F.3d 880, 891–92 (9th Cir.2004) (state court competency determinations of criminal defendants presumed correct).

In this case, the victim testified at the pretrial competency hearing.  She was sworn in, was able to distinguish between truth and lies, recalled a lot of detail about her life, past and present, and testified about the abuse Elliott subjected her to.  ECF No. 26, Exhibit 19, Verbatim Report of Proceedings, at 57-91. She testified how Elliott on several occasions licked her vagina with his tongue. She testified she did not remember going to the hospital, seeing Elliot's penis, or having a doctor examine her vagina. *Id.*  The 2005 trial court heard this testimony and found that the competency finding by the trial judge in 2003 was relevant.  Before making his competency finding, the trial judge analyzed the victim's 2005 competency hearing testimony in light of the earlier findings, his impressions of the 2005 hearing testimony, and Washington's

REPORT AND RECOMMENDATION - 13

*Allen* factors.  ECF No. 41, Exhibit 20, Verbatim Report of Proceedings, at 348-352.  The trial court conducted a well-reasoned and thorough analysis of the victim's testimony, found the child was competent, and concluded the factual questions in regard to her testimony would be for the jury to determine.  *Id.* at 352.

Mr. Elliott fails to present clear and convincing evidence rebutting the presumptively correct state court finding as to competency. § 2254(e)(1); *Haliym*, 492 F.3d at 700.   It is also not the province of a federal habeas court to reexamine state-court determinations on state-law questions.  *Estelle*, 502 U.S. at 67–68.  Federal habeas corpus relief is available only to a person "in custody in violation of the Constitution or laws or treaties of the United States." § 2254(a).

Mr. Elliott's challenges to the competency determination identify no federal constitutional violation and are, accordingly, subject to dismissal. See generally *Walters*, 122 F.3d at 1175 ("Admission of the testimony of the child victim, K.C., is an evidentiary issue that the Montana trial court addressed under Montana law. We do not review the admission for error; 'we may only consider whether [Walters's] conviction violated constitutional norms.'") (quoting *Jammal v. Van de Kamp*, 926 F.2d 918, 919 (9th Cir.1991)).

Nor does Mr. Elliott otherwise demonstrate a Confrontation Clause violation. As stated above, the Confrontation Clause is not offended merely by the existence of flaws in M.J.'s testimony.  *Owens*, 484 U.S. at 558, and *Walters*, 122 F.3d at 1175–76.  The question is whether Mr. Elliott was afforded a "'full and fair opportunity to probe and expose these infirmities through cross-examination, thereby calling to the attention of the factfinder the reasons for giving scant weight to the witness' testimony.'"  *Owens*, 484 U.S. at 558 (quoting *Fensterer*, 474 U.S. at 21–22).

REPORT AND RECOMMENDATION - 14

In this case, M.J. testified and was subject to cross-examination.  This full and fair opportunity for cross-examination—allowing petitioner to both explore weaknesses in her testimony and to question her about circumstances surround her prior out-of-court statements – satisfied Mr. Elliott's constitutional rights under the Confrontation Clause. Also, to the extent petitioner challenges the state court's determination of the reliability of the hearsay statements under state law, such challenges do not present a constitutional issue subject to review in this habeas matter. *Estelle*, 502 U.S. at 67–68, 71–72.

Mr. Elliott fails to demonstrate that the state court's consideration of this claim was either contrary to or an unreasonable application of federal law, or to in any respect demonstrate a violation of his constitutional rights entitling him to habeas relief.  Accordingly, Mr. Elliott's second ground for relief should be denied.

**B.      Sub-Claim One of Ground Five – Reliability and Validity of MGQT Polygragh**

In sub-claim one of Ground Five, Mr. Elliott claims that the trial court failed to properly consider the reliability and validity of the MGQT polygraph.  ECF No. 1, at 26.

The Washington Court of Appeals found that the trial court did not abuse its discretion in admitting the stipulated polygraph:

> Elliott argues that the trial court erred in admitting the stipulated polygraph results into evidence.  He contends that polygraph results are inherently unreliable and should not be admitted into evidence because they pollute the fairness of the trial and impermissibly invade the province of the jury.
>
> Generally, a court may admit polygraph results only if the prosecutor and the defendant stipulate to their admission.  *Elliott,* 121 Wn. App. at 407 (citing *State v. Renfro*, 96 Wn.2d 902, 905, 639 P.2d 737 (1982)).  The stipulation must allow the opposing part to cross-examine the test examiner about his qualifications and training, the test conditions, the limitations of the test and potential for error, and any other matter the trial court deems pertinent.  *Elliott,* 121 Wn. App. at 407 (citing *Renfro,* 96 Wn.2d at 907).  But even with a proper

REPORT AND RECOMMENDATION - 15

stipulation, the trial court retains the power to reject evidence of the test results. *Elliott,* 121 Wn. App. at 407 (citing *Renfro,* 96 Wn.2d at 906-07).

Here, the trial court denied Elliott's motion to exclude the stipulated polygraph because it found that Barnes had the appropriate level of training to administer the test and that he did so appropriately.  The trial court also allowed Elliott to cross-examine Barnes about his interpretation of the polygraph examination, his training and experience, the conditions under which he administered the exam, the limitation of polygraph testing, and the possibility of error in his results.  The trial court did not abuse its discretion in admitting the stipulated polygraph.

ECF No. 16, Exhibit 5, at 7-8.

The Washington Court of Appeals concluded the trial court did not abuse its discretion in admitting the stipulated State-conducted MGQT polygraph results because Detective Barnes, the polygraph examiner, had the appropriate level of training to administer the test and he appropriately conducted it.  In addition, Mr. Elliott's counsel cross-examined Barnes about his interpretation of the polygraph results, his training and experience, the conditions under which he administered the exam, the polygraph's limitations, and the possibility of error.   ECF No. 16, Exhibit 5, at 8.

The appellate court's factual findings are presumed correct and Mr. Elliott has not rebutted them with clear and convincing evidence.  28 U.S.C. § 2254(e)(1).  Mr. Elliott's counsel cross-examined Detective Barnes about his qualifications, conditions of the MGQT test, and the possibility of error.  ECF No. 26, Exhibit 18, Verbatim Report of Proceedings, at 836-852, 859-860.  Washington's court-created evidentiary rule allows admission of stipulated polygraph results based on certain conditions such as the opportunity for the opposing party to cross-examine the polygraph examiner about his or her qualifications, test conditions, and results of the test.

REPORT AND RECOMMENDATION - 16

"[A] federal habeas court may not prescribe evidentiary rules for the states." *Swan v. Peterson*, 6 F.3d 1373, 1382 (9th Cir. 1993). Consequently, alleged errors in the admission of the evidence are generally a matter of state law and are not cognizable in a federal habeas corpus proceeding. *Estelle v. McGuire*, 502 U.S. 62 (1991). Respondent found no United States Supreme Court precedent to invalidate the state rule allowing conditional admission of the stipulated polygraph results if the opposing party is allowed to cross-examine the test examiner and this Court is unaware of any such precedent. Thus, the Washington Appellate Court's holding that the trial court did not abuse its discretion in admitting the stipulated polygraph results cannot be contrary to or an unreasonable application of federal law. *See Wright v. Van Patten*, 552 U.S. 120, 126 (2008):

> Because our cases give no clear answer to the question presented, let alone in Van Patten's favor, "it cannot be said that the state court unreasonabl[y] appli[ed] clearly established Federal law" (citing to *Carey v. Musladin*, 549 U.S. 70, 77 (2006).

*See also, Berghuis v. Smith,* 130 S. Ct. 1382, 1388 (2010); *Dows v. Wood*, 211 F.3d 480, 486 (9th Cir. 2000) (in the absence of the United States Supreme Court precedent on point, Washington State Courts did not reach a result that was contrary to or an unreasonable application of clearly established federal law); *Stevenson v. Lewis*, 384 F.3d 1069, 1072 (9th Cir. 2004).

The Washington Appellate Court did not reach a result that was contrary to or an unreasonable application of clearly established law. Thus, Mr. Elliott is not entitled to habeas relief on sub-claim one of ground five of his petition and this claim should be dismissed.

REPORT AND RECOMMENDATION - 17

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

**C.      Ground Nine -  Admissibility of Child Hearsay Statements**

In Ground Nine, Mr. Elliott asserts that the admission of various child hearsay statements was in error because M.J. was unavailable pursuant to R.C.W. 9A.44.120 and, therefore, before any child hearsay statements could be admitted the trial judge had to independently determine whether the statements met the requirements of R.C.W. 9A.44.120(1) and (2)(b).  Mr. Elliott identifies the pertinent child hearsay statements as those testified to by the nurse-practitioner, child forensic interviewer and M.J.'s mother.  ECF No. 1, at 28.  He argues that the admission of this testimony was impermissible because M.J. "was incompetent and as such unavailable and the Trial Court had to subject the hearsay evidence to further review."  *Id.*

On direct review the Washington Court of Appeals addressed this claim on the merits and rejected it:

III.  DENIAL OF MOTION TO EXCLUDE CHILD HEARSAY TESTIMONY

Elliott argues that the trial court erred by denying his motion to exclude child hearsay statements because (1) the trial court improperly adopted the ruling from Elliott's first trial that the statements were admissible and (2) M.J.'s lack of an independent memory of events deprived him of effective cross examination in violation of the confrontation clause.

A.      Trial Court's Use of Previous Trial Court's Ruling on Admissibility

Before Elliott's first trial, the trial court determined that M.J.'s hearsay statements were admissible because they complied with RCW 9A.44.120.[2]  At the second trial, a different trial court adopted the first trial court's ruling.  Elliott argues that the second trial court erred in not holding an independent hearsay hearing because M.J.'s testimony had substantially changed over the two-and-a-half years that separated the two trials.  The State counters that Elliott cannot raise the issue on appeal because he did not object to the procedure below.

The State is correct that Elliott did not raise the issue below and, generally, we will consider an issue raised for the first time on appeal only if it constitutes manifest error that affects a constitutional right.  RAP 2.5(a).  As stated earlier, the defendant must show actual and identifiable prejudice to his

REPORT AND RECOMMENDATION - 18

constitutional rights at trial to establish manifest error. *Kirkman,* 159 Wn.2d at 935.

Regardless of whether the error alleged here meets this standard, Elliott's argument fails. We allow the trial court wide discretion in determining how best to manage the issues before it. *Snyder v. State,* 19 Wn. App. 631, 636, 577 P.2d 160 (1978). Elliott cites no authority in support of the proposition that the trial court must conduct separate hearsay hearings at each trial involving the same statements. At least two courts have characterized prior rulings that a hearsay statement complied with RCW 9A.44.230 as the law of the case and dispensed with any further hearsay hearings on those statements. *In re Pers. Restraint of Grasso,* 151 Wn.2d 1, 7-8, 84 P.3d 859 (2004); *State v. Przybylski,* 48 Wn. App. 661, 663, 739 Pl.2d 1203 (1987). A trial court's decision to adhere to a prior evidentiary ruling protects "'[t]he circumstantial guarantees of trustworthiness on which the various specific exceptions to the hearing rule are based'" because the guarantee "'are those that existed at the time the statement was made and do not include those that may be added by using hindsight.'" *State v. Ryan,* 103 Wn.2d 165, 174, 691 P.2d 197 (1984) (quoting *Huff v. White Motor Corp.,* 609 F.2d 286, 292 (9th Cir. 1979)). Thus, the trial court's adoption of the previous trial court's determination of admissibility was not error.

B.     Confrontation Clause

Still, Elliott maintains that the "material changes in M.J.'s description make it clear that she did not retain an independent memory of the event and therefore removed the possibility of true 'confrontation' of her allegations against Elliott." Br. of Appellant at 13. The word "testify" in RCW 9A.44.120 implicates the confrontation clause of the Sixth Amendment. *State v. Rohrich,* 132 Wn.2d 472, 476, 939 P.2d 697 (1997). Nevertheless, hearsay statements do not violate the confrontation clause if "the hearsay declarant is a witness at trial, is asked about the event and the hearsay statement, and the defendant is provided an opportunity for full cross-examination." *Grasso,* 151 Wn.2d at 17 (quoting *State v. Clark,* 139 Wn.2d 152, 159, 985 P.2d 377 (1999)).

Here, the state questioned M.J. about the specifics of the alleged abuse and about the contents of the hearsay testimony. To elicit testimony about the alleged abuse, the prosecutor asked if Elliott had touched her in a way that made her feel uncomfortable and where he touched her. The prosecutor also asked M.J. to identify the part of his body that Elliott used to touch her. Regarding the hearsay statements, the prosecutor asked M.J. if she remembered going to the hospital and if she remembered ever seeing a doctor. That M.J. answered some of these questions with answers that contradicted her earlier hearsay statements and another with "I can't remember" did not deprive Elliott of his right to confront and cross-examine her about the alleged abuse and the hearsay statements. RP (Jan. 31, 2005) at 168. On cross examination, Elliott brought out the

REPORT AND RECOMMENDATION - 19

inconsistencies between M.J.'s testimony and her hearsay statements.  For example, counsel asked, "Did you ever see his penis?"; "He never put his penis in your vagina?"; "Do you remember ever telling someone that Brian was making milk?'; 'Do you remember when you told your mom about it?'; and "Where were you when you told them?"  (RP (Jan. 31, 2005) at 191-92.

In evaluating whether the hearsay testimony complies with the confrontation clause, we focus on the direct examination, not the cross examination or the victim's response.  *Grasso,* 151 Wn.2d at 29-30.  A victim's equivocation or denial of the hearsay statement is a constitutionally valid response.  *Grasso,* 151 Wn.2d at 17; *See also Clark,* 139 Wn.2d at 154-55, 161 (victim testified in a hearsay hearing to the alleged abuse but recanted on direct examination; court held this was sufficient to allow the defendant to cross-examine and, thus, satisfied the confrontation clause).

Here, M.J. was a witness at trial, she was asked about the event and the hearsay statements, and Elliott fully cross-examined her.  Thus, the confrontation clause does not bar the admission of M.J.'s hearsay statement.  *Grasso,* 151 Wn.2d at 17.

[2]Under RCW 9A.44.120, a court may admit child hearsay statements if it finds "in a hearing conducted outside the presence of the jury, that the time, content, and circumstances of the statement provide sufficient indicia of reliability."  RCW 9A.44.120(1).  In addition the child must either testify at the proceedings or be unavailable as a witness, provided that when the child is unavailable, such statement may be admitted only if there is corroborative evidence of the act. RCW 9A.44.120(2).

ECF No. 16, Exhibit 5, at 12-15.

In his personal restraint petition, Mr. Elliott again raised the admissibility of the hearsay statements of the nurse-practitioner, child forensic interviewer and M.J.'s mother as violations of his Sixth Amendment right of confrontation and Fourteenth Amendment right of due process.

ECF No. 8, at 30-55.  The Washington Court of Appeals rejected this claim:

Admissibility of Child Witness Statements

Elliott argues that the trial court erred in allowing Christa Sommerfeld, Michelle Breland and Hesper Johnson to testify about statements made by M.J. without first finding, under RCW 9A.44.120, that the circumstances of the statements provided sufficient indicia of reliability.  [fn 3:  In his first trial, which resulted in convictions and then reversal on appeal, the trial court found the hearsay statements admissible.  The judge in the second trial adopted the ruling from the first trial and did not hold additional pre-trial hearings on admissibility

REPORT AND RECOMMENDATION - 20

or make a separate ruling on admissibility.]  This court considered, and rejected, Elliott's arguments in his direct appeal.  He may only raise the arguments again if he shows that the interest of justice require relitigation.  *In re Personal Restraint of Davis,* 152 Wn.2d 647, 670-71, 101 P.3d 1 (2004).  Elliott does not make such a showing.

…

Admissibility of M.J.'s Hearsay Statements

Elliott argues that the trial court erred in allowing Sommerfeld, Breland and Johnson to testify about statements made by M.J. because M.J. was not competent to testify, and/or did not "testify" within the meaning of RCW 9A.44.120.  However, in Elliott's direct appeal this court concluded that M.J. was competent to testify and did testify within the meaning of RCW 9A.44.120.  Again, he does not show that the interests of justice require relitigation of this issue.

ECF No. 16, Exhibit 10, at 3-4.

As noted above in the Court's discussion of Mr. Elliott's second ground for habeas relief, Mr. Elliott has failed to rebut, by clear and convincing evidence, the appellate court's factual findings regarding the competency hearing and the trial court's determination that the victim was competent to testify.  28 U.S.C. § 2254(e)(1).  He also fails to demonstrate a Confrontation Clause violation when the victim was available to testify and Mr. Elliott in fact had, a full and fair opportunity to probe and expose any infirmities in her testimony through cross-examination.

Liberally construed, Mr. Elliott's habeas claim may be interpreted as a claim that his due process rights were violated when the second trial court adopted the first trial court's competency findings without holding a separate hearing.  Where state or federal law provides that a competency determination must be made, failure to conduct an appropriate hearing implicates a defendant's due process rights.  *Sinclair v. Wainwright*, 814 F.2d 1516, 1522-23 (11th Cir.1987) (competency of insane witness); see *Kentucky v. Stincer,* 482 U.S. 730, 745, 107 S.Ct. 2658, 2667 (1987) (due process claim arising out of exclusion from child's competency hearing).  After

REPORT AND RECOMMENDATION - 21

1   a defendant raises a colorable objection to the competency of a witness, the trial court must

2   perform "a reasonable exploration of all the facts and circumstances" concerning competency.

3   *Sinclair*, 814 F.2d at 1523.

4           However, Mr. Elliott cites no authority in support of the proposition that the trial court

5   must conduct separate hearings at each trial involving the same child hearsay statements.

6   Moreover, the trial court has wide discretion in determining how best to manage the issues

7   before it.  *Snyder v. State,* 19 Wn. App. 631, 636, 577 P.2d 160 (1978).  As noted by the

8   Washington Appellate Court, at least two Washington courts, *Grasso* and *Przybylski,* have

9   characterized prior rulings that a hearsay statement complied with RCW 9A.44.230 as the law of

10  the case and dispensed with any further hearsay hearings on those statements.  Thus, the trial

11  court's adoption of the previous trial court's determination of admissibility was not error.

12          Moreover, the record reflects that the trial court inquired extensively into the matter and

13  heard substantial testimony indicating that M.J. was competent.  ECF No. 26, Exhibit 19,

14  Verbatim Report of Proceedings, at 57-91.  At the 2005 competency hearing that occurred prior

15  to Mr. Elliott's second trial, the victim testified, was sworn in, was able to distinguish between

16  truth and lies, recalled a lot of detail about her life, past and present, and testified about the abuse

17  Elliott subjected her to.  *Id.*  She testified how Elliott on several occasions licked her vagina with

18  his tongue.  She testified she did not remember going to the hospital, seeing Elliot's penis, or

19  having a doctor examine her vagina.  *Id.*

20          The Washington Court of Appeals reviewed the 2005 competency hearing that occurred

21  prior to Elliott's second trial.  Mr. Elliott's argument that the child was incompetent because she

22  could not distinguish truth from lie and the events could not have occurred exactly as she

23  testified was rejected by the appellate court for two reasons.  One, her ability to distinguish truth

24

25

26

REPORT AND RECOMMENDATION - 22

from lies did not depend on her ability to remember the specific events contested at trial, and two, the inconsistencies in her testimony went to her credibility, not competency.  ECF No. 16, Exhibit 5, at 18.  The appellate court concluded the trial court did not abuse its discretion under *Allen* in deciding the victim was competent. *Id.*  Thus, the 2005 trial court properly exercised its discretion in admitting the testimony. See *in re Dependency of A.E.P.*, 135 Wash.2d 208, 223, 956 P.2d 297 (1998) (appellate courts give great deference to trial court's determination of child's competency to testify).  There was no due process violation.

The Washington Appellate Court did not reach a result that was contrary to or an unreasonable application of clearly established law.  Mr. Elliott is not entitled to habeas relief on his ninth ground and this claim should be dismissed.

## CERTIFICATE OF APPEALABILITY

A petitioner seeking post-conviction relief under 28 U.S.C. § 2254 may appeal a district court's dismissal of his federal habeas petition only after obtaining a certificate of appealability from a district or circuit judge.  A certificate of appealability may issue only where a petitioner has made "a substantial showing of the denial of a constitutional right."  *See* 28 U.S.C. § 2253(c)(3).  A petitioner satisfies this standard "by demonstrating that jurists of reason could disagree with the district court's resolution of his constitutional claims or that jurists could conclude the issues presented are adequate to deserve encouragement to proceed further." *Miller-El v. Cockrell*, 537 U.S. 322, 327 (2003).

Under this standard and based on a thorough review of the record and analysis of the law in this case, this Court concludes that Mr. Elliott is not entitled to a certificate of appealability with repect to Grounds Two, Sub-Claim One of Ground Five, and Ground Nine of his habeas petition.

REPORT AND RECOMMENDATION - 23

**CONCLUSION**

The Court recommends Denying Petitioner's § 2254 petition with prejudice as to Grounds Two, Sub-Claim One of Ground Five, and Ground Nine because the state court adjudication was not contrary to nor an unreasonable application of established federal law and was not an unreasonable determination of the facts in light of the evidence presented, see 28 U.S.C. § 2254(d)(1)-(2).

Pursuant to 28 U.S.C. § 636(b)(1) and Fed. R. Civ. P. 72(b), the parties shall have fourteen (14) days from service of this Report and Recommendation to file written objections. See also Fed. R. Civ. P. 6. Failure to file objections will result in a waiver of those objections for purposes of appeal. *Thomas v. Arn*, 474 U.S. 140 (1985). Accommodating the time limit imposed by Rule 72(b), the Clerk is directed to set the matter for consideration on **November 30, 2012**, as noted in the caption.

**DATED** this  9th  day of November, 2012.

Karen L. Strombom
United States Magistrate Judge

REPORT AND RECOMMENDATION - 24